UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITES STATES OF AMERICA,               :

      -v-                               :       09 Cr. 524 (JSR)

                                        :
CHIGBO PETER UMEH, et al.,               :       OPINION

      Defendants.                       :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

      The Indictment in this case[1] charges a far-flung conspiracy by defendants Chigbo Peter Umeh, Jorge Ivan Salazar Castano, Konstantin Yaroshenko, Nathaniel French, Kudufia Mawuko, and Marcel Acevedo Sarmiento to violate the federal narcotics laws through drug trafficking that extends from South America to Africa to Europe to the United States. The role of defendant Yaroshenko is summarized in paragraph 7 of the Indictment as follows:

> [Yaroshenko] was an aircraft pilot and aviation expert who transported thousand-kilogram quantities of cocaine throughout South America, Africa, and Europe. Yaroshenko indicated that he utilized and managed at least five different airplanes through which he arranged for the transportation of this cocaine. In his capacity as a pilot and businessman, Yarhoshenko agreed to supply the aircraft, pilots, and crew that were to be used for shipments of cocaine from South America to Liberia, as well as from Liberia to other locations within West Africa. Yaroshenko understood that from Liberia, portions of this cocaine would subsequently be imported into the United States.

      On October 13, 2010, Yaroshenko moved to dismiss the Indictment and for other relief. In his supporting memorandum ("Def.

---

[1] Technically, the Ninth Superseding Indictment ("Indictment").

Mem."), Yaroshenko argued that the Indictment should be dismissed because of "extreme governmental misconduct which includes (1) torture, brutal and inhumane treatment of the Defendant during his detention at an unidentified location in Liberia by undisclosed individuals, one of whom was the DEA agent indentified in the Indictment as 'CS'; (2) secret transfer of Konstantin Yaroshenko to the United States in violation of foreign and international laws; (3) secret recordings of the conversations in Ukraine in violation of Ukrainian laws and international law; [and] (4) manufacturing the United States jurisdiction." Def. Mem. at 1-2. Alternatively, Yaroshenko argued that the Indictment should be dismissed because the United States Government "manufactured jurisdiction." Id. at 2. Additionally, he sought: "(i) an Order for [an] evidentiary hearing on the issues of outrageous governmental misconduct and manufactured jurisdiction; (ii) an Order suppressing recordings obtained in violation of laws in Ukraine; (iii) an Order striking surplusage from the Indictment; and (iv) an Order requiring the Government to provide discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure and permitting the Defendant to file other motions based on the responses to the discovery requests." Id.

The Government filed a Memorandum in Opposition ("Gov. Mem.") on October 27, 2010; Yaroshenko filed reply papers on November 3, 2010; and the Court heard oral argument on November 18, 2010. After careful consideration, the Court issued an Order on November 29, 2010

denying the motion in its entirety.  This Opinion explains the
reasons for that decision and reaffirms the denial in all respects.

    The four prongs of Yaroshenko's "extreme governmental
misconduct" motion, as quoted above, are in many respects distinct.
For example, the manufactured jurisdiction allegation has little or
nothing to do with the other three components, as Yaroshenko himself
implicitly recognizes by separately repeating it as an independent
basis for dismissal.  Nonetheless, Yaroshenko insists that at least
the first two prongs -- brutal treatment and illegal abduction -- are
interrelated.  Thus, he alleges that on May 28, 2010, he was
"abducted" from the Royal Hotel in Monrovia and brought to an
unidentified location in Liberia, where at least two United States
agents were present.  Def. Mem. at 3. Yaroshenko claims he was then
tortured, abused, starved, deprived of sleep, and beaten so severely
that he lost two teeth.  Affidavit of Konstantin Yaroshenko, dated
October 9, 2010, Def. Ex. A, ¶¶ 7-30.  He further alleges that his
assailants threatened him with rape, and his family with death.  See
Def. Mem. at 4-5.  He claims that after several days of this brutal
treatment, American agents transported him by plane to the United
States.  Yaroshenko Aff. ¶¶ 37-42.  (Yaroshenko appeared in this
District on June 2, 2010.  Gov. Mem. at 2.)  This removal, he says,
was unlawful both because of the background of brutality that led up
to it and also because it violated international law.  Although he
acknowledges that the Liberian Ministry of Justice issued a valid

3

Expulsion Order for his removal on May 30, 2010, he claims that
Liberia otherwise disregarded the law under the Alien and Nationality
Law of the Republic of Liberia ("ANL") in effectuating the Expulsion
Order.  Def. Mem. at 9-10.  He further contends that the United
States violated Article 13 of the International Covenant on Civil and
Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, which provides
that "[a]n alien lawfully in the territory of a State Party to the
present Covenant may be expelled therefrom only in pursuance of a
decision reached in accordance with the law . . . ."  Def. Mem. at
10.  Additionally, he claims the Government forcibly brought
Yaroshenko (a Russian citizen) to the United States without notifying
Russia of his arrest, an action that purportedly violated the Vienna
Convention on Consular Relations, Apr. 18, 1961, 23 U.S.T. 3227,
T.I.A.S. No. 7502 (entered into force in U.S. Dec. 13, 1972).  Def.
Mem. at 11.

Nonetheless, even if one accepts all these allegations and
assertions as true for purposes of this motion, they still reduce,
analytically, to two distinct claims: that Yaroshenko was tortured
and beaten in connection with his arrest and detention, and that he
was abducted illegally.  The law is well settled that neither of
these claims warrants dismissal of an indictment.

As to the former claim, while police brutality or other
misconduct may lead to suppression of a defendant's statements or
other evidence garnered thereby, it does not lead to the dismissal of

4

the indictment or "deprive the Government of the opportunity to prove

[the defendant's] guilt through the introduction of evidence wholly

untainted by the police misconduct." <u>United States v. Crews</u>, 445

U.S. 463, 474 (1990).  For example, in <u>Brown v. Doe</u>, 2 F.3d 1236 (2d

Cir. 1993), the Second Circuit held that dismissal of the indictment

was not appropriate where a defendant was repeatedly beaten after his

arrest.  <u>Id.</u> at 1240.  Similarly, in the recent case of <u>United States

v. Ghailani</u>, No. S10 98 Cr. 1023 (LAK), 2010 WL 1839030 (S.D.N.Y. May

10, 2010), Judge Kaplan held that the defendant's claims that he had

been tortured by the CIA in violation of his rights under the Due

Process Clause did not state a ground for dismissal.

As to the abduction claim, even assuming <u>arguendo</u> that

Yaroshenko's removal violated various laws and treaties and thus was

the equivalent of an illegal, forcible abduction, the Supreme Court

has flatly held that "the power of a court to try a person for [a]

crime is not impaired by the fact that he had been brought within the

court's jurisdiction by reason of a 'forcible abduction.'" <u>Frisbie

v. Collins</u>, 342 U.S. 519, 522 (1952)(citing <u>Ker v. Illinois</u>, 119 U.S.

436, 444 (1886)).

Yaroshenko acknowledges that these precedents defeat the

first two prongs of his "governmental misconduct" motion if taken

separately.  But he insists that a special situation is presented

when both circumstances are present, that is, where the forcible

abduction is accompanied by torture.  According to Yaroshenko, this

5

particular combination of circumstances entitles him to relief under
the Second Circuit case of United States v. Toscanino, 500 F.2d 267
(2d Cir. 1974).  The defendant in Toscanino was convicted of
conspiracy to import narcotics into the United States in violation of
21 U.S.C.S. §§ 173 and 174.  He appealed the conviction, arguing that
"the court acquired jurisdiction over him unlawfully through the
conduct of American agents who kidnapped him in Uruguay, used illegal
electronic surveillance, tortured him and abducted him to the United
States for the purpose of prosecuting him here."  500 F.2d at 268.
The Toscanino court recognized the existence of the Ker-Frisbie
doctrine, but asserted that the doctrine had been "ero[ded]" and
"weakened" by other Supreme Court decisions, including Rochin v.
California, 342 U.S. 165 (1952), and United States v. Russell, 411
U.S. 423 (1973).  Id. at 273.  Speculating that a court might "'some
day be presented with a situation in which the conduct of law
enforcement agents is so outrageous that due process principles would
absolutely bar the government from invoking judicial processes to
obtain a conviction,'" id. at 273 (quoting Russell, 411 U.S. at 431-
32), the Toscanino court held that due process "requir[ed] a court to
divest itself of jurisdiction over the person of a defendant where it
has been acquired as the result of the government's deliberate,
unnecessary, and unreasonable invasion of the accused's
constitutional rights."  Id. at 275.  Accordingly, the court remanded
the case for an evidentiary hearing to determine if the defendant

6

could offer credible evidence in support of his allegations.  Id. at
281.

　　　　The first two prongs of Yaroshenko's "governmental
misconduct" motion are arguably similar enough to those in Toscanino
that if Toscanino were still good law, this Court might be obliged to
grant Yaroshenko's request for an evidentiary hearing.  (No more than
this would be warranted at this stage, however, as the Government has
not only firmly denied all of Yaroshenko's allegations but also
adduced photographs and other evidence that suggest that his claims
are fabricated.)  But no such hearing is required here, because it is
reasonably clear that Toscanino is no longer good law.

　　　　To begin with, despite that assertion in Toscanino that the
Ker-Frisbie doctrine had been undermined, the Supreme Court
reaffirmed the Ker-Frisbie doctrine within a year of Toscanino, and
has done so repeatedly ever since.  See, e.g., United States v.
Alvarez-Machain, 504 U.S. 655, 660-62, 670 (1992) (affirming Ker-
Frisbie and holding that respondent's abduction did not prohibit his
trial in the United States); Immigration & Naturalization Serv. v.
Lopez-Mendoza, 468 U.S. 1032, 1039-40 (1984) ("The 'body' or identity
of a defendant or respondent in a criminal or civil proceeding is
never itself suppressible as a fruit of an unlawful arrest, even if
it is conceded that an unlawful arrest, search, or interrogation
occurred."); United States v. Crews, 445 U.S. 463, 474 (1980) (A
defendant "is not himself a suppressible 'fruit,' and the illegality

7

of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct."); Stone v. Powell, 428 U.S. 465, 485 (1976) ("judicial proceedings need not abate when the defendant's person is unconstitutionally seized"); Gerstein v. Pugh, 420 U.S. 103, 119 (1975) ("Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction."). Tellingly, moreover, "no court has ever applied [Toscanino] to dismiss an indictment." United States v. Yunis, 681 F. Supp. 909, 919 (D.D.C.) (1988), rev'd on other grounds, 859 F.2d 953 (D.C. Cir. 1988).

Furthermore, the Second Circuit itself retreated from the Toscanino decision almost immediately.  In United States ex rel. Lujan v. Gengler, 510 F.2d 62 (2d Cir. 1975), cert. denied, 421 U.S. 1001, 44 L. Ed. 2d 668, 95 S. Ct. 2400 (1975), the Second Circuit again considered a case in which a defendant had alleged an international abduction, but this time had not alleged torture or other brutal treatment.  The Second Circuit clarified and narrowed Toscanino, holding that it applied only where the defendant could prove "torture, brutality, and similar outrageous conduct."  Lujan, 510 F.2d at 65.  Therefore, there was no violation of the due process clause when the defendant alleged only that he had been abducted. Id. at 65-66.  See also Matta-Ballesteros v. Henman, 896 F.2d 255, 261 (7th Cir. 1990).  To be sure, Lujan might be read to implicitly

support Yaroshenko's contention that <u>Toscanino</u> still applies when the abduction is accompanied by torture or the like (although here the alleged torture appears unrelated to the acts of abduction themselves).  But, as noted above, the Second Circuit has subsequently held that the dismissal of an indictment is not appropriate when a defendant was repeatedly beaten after his arrest, <u>see</u> <u>Brown</u>, <u>supra</u>, even though in <u>Brown</u>, unlike here, the beatings were directly attributed to the U.S. agents (as opposed to Liberian authorities).  In short, while the Second Circuit has never explicitly overruled <u>Toscanino</u>, the fact that both of the pillars on which it rests have been removed suggests that all that remains is a rhetorical facade wholly lacking in legal foundation.

Viewing all this, the courts of other circuits have concluded, in effect, that <u>Toscanino</u> is a dead letter, even in the Second Circuit.  <u>See, e.g.</u>, <u>United States v. Best</u>, 304 F.3d 308, 312-13 (3d Cir. 2002) ("In light of these cases, it appears clear that the Ker-Frisbie doctrine has not eroded and that the exception described in <u>Toscanino</u> rests on shaky ground."); <u>United States v. Mitchell</u>, 957 F.2d 465, 470 (7th Cir. 1992) (questioning <u>Toscanino</u>'s "continuing constitutional vitality" in light of the Supreme Court's repeated reaffirmation of the <u>Ker-Frisbie</u> doctrine); <u>Matta-Ballesteros v. Henman</u>, 896 F.2d 255, 261 (7th Cir. 1990) ("We . . . conclude that <u>Toscanino</u>, at least as far as it creates an exclusionary rule, no longer retains vitality and therefore decline

to adopt it as the law of this circuit."); <u>United States v. Darby</u>, 744 F.2d 1508, 1531 (11th Cir. 1984) ("[T]he continuing validity of the <u>Toscanino</u> approach is questionable after the intervening decision in <u>Gerstein v. Pugh</u> . . . ."). This Court agrees, and accordingly concludes that Yaroshenko's motion to dismiss the indictment because of the alleged combination of brutality and abduction fails as a matter of law.

From this it also follows that Yaroshenko's allegations that the United States violated international law in effectuating his transfer to the United States are irrelevant. However, the Court notes that these contentions are invalid in any event. It is uncontroverted that Yaroshenko was extradited to the United States pursuant to a facially valid Expulsion Order issued by the Liberian Government. <u>See</u> Def. Mem. Ex. D. Moreover, the United States is not responsible for ensuring that a foreign sovereign complies with its internal laws in issuing an extradition or expulsion. <u>See, e.g.</u>, <u>United States v. Lira</u>, 515 F.2d 68, 72 (2d Cir. 1975) ("The United States Government did not owe appellant any obligation to enforce his asserted right under Chilean law."); <u>United States v. Salinas Doria</u>, No. 01 Cr. 21 (GEL), 2008 WL 4684229, at * 4 (S.D.N.Y. Oct. 21, 2008) ("[C]harges against a defendant in an American court should not be dismissed solely because of an alleged defect in the judicial or diplomatic processes leading to that defendant's extradition."). Additionally, Yaroshenko cannot himself assert that the Government's

10

alleged failure to notify the Russian consulate of his arrest
violated the Vienna Convention on Consular Relations, as that Treaty
creates no judicially enforceable individual rights, See United
States v. De La Pava, 268 F.3d 157 (2d Cir. 2001), and even if it did
create such rights, dismissal of the indictment would not be the
appropriate remedy. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 350
(2006); United States v. Gomez, 644 F. Supp. 2d 362, 372 (S.D.N.Y.
2009).[2]

Turning to the third prong of Yaroshenko's "governmental
misconduct" motion, Yaroshenko contends that the Government's
activities in obtaining recordings of him in the Ukraine violated
provisions of Ukrainian law that prohibit all foreign law enforcement
activities within its territory, and that the United States, in
failing to request authorization to conduct such activities, thereby
violated Article 2 of the Mutual Legal Assistance Treaty ("MLAT").
Def. Mem. at 8. But even assuming arguendo that the United States
failed to obtain such authorization (a contention which the
Government here flatly disputes), nothing in either Ukrainian law nor
the MLAT suggests that violations of these laws gives rise to any
right of suppression or other judicially enforceable rights of the
defendant in a U.S. court. See, e.g., United States v. Rommy, 506
F.3d 108, 130 (2d Cir. 2007). On the contrary, it is well-settled

---

[2] It may also be the noted that the Russian government has
not filed any protest with this Court.

that "[t]he admissibility of evidence in a United States court depends solely on compliance with United States law." Id. at 129. Accordingly, not only does the third prong add nothing to the dearth of support for Yaroshenko's governmental misconduct motion, but also his separate motion to suppress the recordings on the grounds that these were obtained in violation of Ukrainian law and/or MLAT must be denied.

Turning finally to the fourth prong of Yaroshenko's "governmental misconduct" motion, which Yaroshenko also raises as an independent basis for dismissal, Yaroshenko claims that the Government "manufactured jurisdiction" in this case. The concept of "manufactured federal jurisdiction" is "properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous; or (iii) an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime." United States v. Wallace, 85 F.3d 1063, 1065-1066 (2d Cir. 1996) (internal citations omitted). In his reply brief, Yaroshenko clarifies that he relies on the third potential defense, Def. Reply Mem. at 13. Specifically, he argues that the "Indictment does not

set forth any specific factual allegation that supports the conclusion that Konstantin Yaroshenko agreed to bring any drugs into the United States." Def. Mem. at 13.

As this Court explained in United States v. Al Kassar, 582 F. Supp. 2d 488 (S.D.N.Y. 2008), "the Second Circuit has refused to dismiss indictments 'when there is any link between the federal element and a voluntary, affirmative act of the defendant. Thus, when confronted with situations in which (i) the [Government] introduces a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, . . . federal jurisdiction has not been improperly manufactured.'" 582 F. Supp. at 493 (quoting Wallace, 85 F.3d at 1066 (internal quotation marks omitted)). See also United States v. LaPorta, 46 F.3d 152, 154 (2d Cir. 1994) (rejecting claim of manufactured jurisdiction where "defendants themselves committed the substantial jurisdictional act of burning the government [car]") (citation and internal quotation marks omitted); United States v. Lau Tung Lam, 714 F.2d 209, 211 (2d Cir. 1983) (rejecting claim of manufactured jurisdiction where defendant "himself committed the substantial jurisdictional act of bringing drugs into the United States").

In this case, the Indictment rebuts on its face the claim of manufactured jurisdiction. Specifically, the Indictment lists Yaroshenko's many affirmative, voluntary actions implicating federal

jurisdiction.  For example, the Indictment states that when

"Yaroshenko agreed to supply the aircraft, pilots, and crew that were

to be used for shipments of cocaine from South America to Liberia . .

. . [,] Yaroshenko understood that from Liberia, portions of this

cocaine would subsequently be imported into the United States."

Indict. ¶ 7.  In furtherance of this plan, Yaroshenko met with his

co-conspirators and others to discuss the "logistics, pricing, and

security for transatlantic drug shipments," Indict. ¶ 1, and

indicated that he would charge $4.5 million for the air shipment of

five tons of cocaine from South America to West Africa, where it

would then be loaded onto a direct flight to New York.  See Indict.

¶¶ j-r.  Without multiplying examples, the Indictment clearly charges

instances where Yaroshenko took "voluntary actions that implicate the

federal element[s]" of the charged crimes, which is enough for

jurisdictional purposes.  See Wallace, 85 F.3d at 1066.  Any

remaining factual disputes regarding this issue can and should be

resolved at trial.

        Yaroshenko also contends that there was an insufficient nexus

between him and the United States, such that prosecuting him here

violates his Fifth Amendment due process rights.  See Def. Mem. at

18; United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003) ("[I]n

order to apply extraterritorially a federal criminal statute to a

defendant consistent with due process, there must be a sufficient

nexus between the defendant and the United States, so that such

application would not be arbitrary or fundamentally unfair.")
(quoting United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)
(citation omitted).  Again, according to the Indictment, Yaroshenko
knew that at least a portion of the cocaine would be sold in the
United States; he was also instrumental in ensuring the cocaine would
reach its intended destination.  It therefore cannot be fairly argued
that his conduct was so "unrelated to American interests as to render
[his] prosecution in the United States arbitrary or fundamentally
unfair."  Yousef, 327 F.3d at 112.  The "manufactured jurisdiction"
argument must therefore fail.

    Yaroshenko also moves to strike surplusage from this
Indictment on the ground that it is prejudicial.  Def. Mem. at 20.
However, "if evidence of the allegation is admissible and relevant to
the charge, then regardless of how prejudicial the language is, it
may not be stricken."  Id. (quoting United States v. DePalma, 461 F.
Supp. 778, 797 (S.D.N.Y. 1978)).  In this case, Yaroshenko asks that
the reference to FARC as an international terrorist organization be
stricken from the Indictment.[3]  Def. Mem. at 20.  However, this
reference is relevant to the conspiracy charge, as it explains the
scope and purpose of the conspiracy.  The "Government may broadly

---

[3] Yaroshenko also requests that the Court strike the allegation
that Yaroshenko "transported cocaine through South America,
Africa, and Europe" because "Yaroshenko is charged with the crime
of conspiracy to import narcotics not the actual transportation
of drugs."  Def. Mem. at 21.  This claim merits no discussion,
however, as the Indictment clearly charges Yaroshenko with the
transportation of drugs.  See Indict. ¶ 11.

allege that which it intends to prove and that which, under applicable principles of law it may prove," <u>DePalma</u>, 461 F. Supp. at 797, and its reference to FARC as a potential orchestrator of the conspiracy falls well within the scope of permissible allegations. Moreover, the Court agrees with the Government that the motion is premature in any event, as the proper time to weigh the relevance of evidence against its potential prejudicial effect is during the trial itself.  This is especially true given that the defendant will suffer no actual prejudice from the inclusion of this reference in the Indictment, since it is this Court's practice never to submit an Indictment to the jury.  Accordingly, the motion to strike surplusage is denied as well.

Finally, Yaroshenko moves the Court to order the Government to provide Rule 16 discovery materials.  Def. Mem. at 22.  The Court finds, however, that the Government has fully complied with its Rule 16 obligations, and the motion is accordingly denied as moot.

For all the foregoing reasons, the Court hereby reaffirms its Order of November 29, 2010 denying Yaroshenko's motion in all respects.

JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        December 30, 2010

16