

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 7, 2020

**BY ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Chigbo Peter Umeh*, 09 Cr. 524 (JSR)

Dear Judge Rakoff:

      The Government respectfully submits this letter in opposition to defendant Peter Chigbo Umeh's motion to reconsider its denial of compassionate release under 18 U.S.C. § 3582(c) or alternatively to order him to serve his sentence on home confinement. The defendant makes this request just 122 months into his 360-month sentence, which this Court imposed in July 2011, following the defendant's conviction at trial for trafficking thousands of kilograms of cocaine, some of which were to be imported into the United States—his second federal conviction for the same crime. The Court previously denied a *pro se* motion for release, then granted a motion to have counsel appointed to file a motion for reconsideration. *See* Dkt. ##165-168. In his counseled filing, the defendant claims that his obesity, uncontrolled hypertension, and sickle cell trait necessitate his release from prison nearly 20 years early. *See* Dkt. #172.

      His motion should be denied because the defendant's proven dangerousness as well as the sentencing factors in 18 U.S.C. § 3553(a) weigh heavily against reducing his sentence by at least 60%.[1] As discussed at greater length below, the defendant is a recidivist who has sustained *multiple* federal convictions for trafficking massive quantities of drugs into the United States. Presentence Investigation Report ("PSR") ¶¶ 64-72. As the Court no doubt recalls, the defendant returned to large-scale international drug trafficking after serving a 97-month federal sentence stemming from a guilty plea to *four* separate federal indictments filed in different states across the country. *Id.* This demonstrates beyond any doubt that he is a threat to reoffend and to harm citizens of this country and others by shipping thousands of kilograms of poison across

---

[1] The defendant asserts that he has served almost half of his sentence. He has not. He was arrested in 2010, ten years ago, and was sentenced to thirty years' imprisonment. Even if the Court looks to his anticipated release date in 2036 (which assumes good-time credit), he still has more than fifteen years remaining, having served only ten. Using the numbers most favorable to him, he has served about 38-40% of his sentence.

August 7, 2020
Page 2

international borders. When analyzing § 3553(a) in the first instance, this Court found that a 360-month sentence was "not greater than necessary" to achieve the goals of sentencing, and it is inconceivable that those goals could now be achieved after only 122 months.

In addition, although one of the defendant's medical conditions—obesity—is an "extraordinary and compelling reason[]" for release in that the Centers for Disease Control and Prevention ("CDC") recognizes it as a COVID-19 risk factor,[2] his body mass index ("BMI") is 30.6, only slightly above the threshold for obesity, which is 30. *See* Ex. C at 10, 11. He crossed this threshold within the last two years, and he can clearly "recover" from it through diet and exercise, which he has discussed with BOP medical personnel. *See id.* at 14, 16, 22; Ex. A at 8 (in 2018, BMI was 29). His two other claimed conditions, meanwhile, are not proven risk factors for COVID-19 at all. The CDC notes that essential (as opposed to pulmonary) hypertension *might* be a risk factor, but the data is inconclusive. And while sickle cell *disease* is a risk factor, merely carrying the genetic trait that could theoretically lead to the disease sometime in the future is not itself a risk factor. As discussed below, Courts in this District have overwhelmingly denied motions for release based on the conditions of essential hypertension and sickle cell trait. There is also no suggestion in his motion or medical records that the defendant has experienced medical distress while in custody, nor is there any suggestion that the Bureau of Prisons ("BOP") has failed to monitor or treat his health needs. To the contrary, even while asserting that his hypertension is "uncontrolled," the defendant acknowledges that "he is currently being treated" for it (indicating that it is, in fact, controlled). Dkt. #167. Furthermore, the defendant is housed at the Federal Correctional Institution at Allenwood in its Low Security facility ("FCI Allenwood Low"), a BOP facility with *one* case of COVID-19.[3] Finally, there is no reason to believe that releasing the defendant is a necessary measure, or even an effective way, to preserve his health given that the rest of the country and the world are grappling with outbreaks of the same virus that he says threatens his life but that has thus far not spread throughout FCI Allenwood Low.[4]

---

[2] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[3] https://www.bop.gov/coronavirus/.

[4] The Court may also deny the defendant's motion for reconsideration for failing to raise any argument or cite any evidence that was unknown or unavailable to him when he filed his original motion. "[A] court may grant reconsideration only where the moving party demonstrates an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Sumlin*, No. 18 Cr. 682 (SHS), Dkt. #49 (S.D.N.Y. July 15, 2020) (citing *United States v. Alvarez-Estevez*, No. 13 Cr. 380 (JFK), 2014 WL 12681364, at *1 (S.D.N.Y. Nov. 6, 2014)). New evidence forms a basis for reconsideration only if it was "previously unavailable" to the moving party. *Alvarez-Estevez*, 2014 WL 12681364, at *1. While benefiting from liberal construction of their pleadings, pro se litigants are still subject to "the same rules that apply to all other litigants." *Oxman v. Drager*, No. 18 Civ. 687 (ALC), 2018 WL 4043136, at *2 (S.D.N.Y. Aug. 13, 2018) (quoting *Farmer v. United States*, No. 15-cv-6287, 2017 WL 3448014, at *2 (S.D.N.Y. Aug. 10, 2017)). The

August 7, 2020
Page 3

This case presents almost the exact scenario that this Court discussed hypothetically in *United States v. Austin*, No. 06 Cr. 991 (JSR), Dkt. #72 (S.D.N.Y. June 23, 2020). In that case, this Court granted release to a defendant who was already at liberty pending resolution of a habeas petition, and who had already served eleven years of a fifteen-year sentence. *Id.* In granting that motion, however, the Court emphasized the highly unusual procedural posture of that case while noting that it likely would have *denied* the motion had it been based entirely on the defendant's age (52), hypertension, mild obesity, and designation to FCI Allenwood, "a facility that has done an excellent job of protecting its population against the virus." *Id.* at 9-10 ("Accordingly, had Austin brought his motion on this ground alone [*i.e.*, his medical conditions and risk of COVID-19 at Allenwood], the Court would have been inclined to deny it."). The Court's analysis in *Austin* was correct and should be the result here, especially given that this defendant has served a lower percentage or a longer sentence than Austin had.

**I.     Background**

      **A.  The Defendant's Offense Conduct[5]**

In the spring of 2009, movant/defendant Chigbo Peter Umeh initiated a series of meetings with government officials in the Republic of Liberia. (Tr. 509-35, 893-922; GX 301). For many years, dating back to the presidency of Charles Taylor, Umeh had been attempting to secure cooperation from government officials in Liberia to use the country as an international transshipment point for narcotics. During the 2009 meetings, Umeh, accompanied by several of his Colombian business partners, proposed that the Liberian officials agree to assist his drug trafficking organization with the movement and storage of several tons of cocaine, which was being supplied to the organization by the FARC—*i.e.*, the Revolutionary Armed Forces of Colombia, known as "*Fuerzas Armadas Revolucionarias de Colombia*," a U.S. State Department designated foreign terrorist organization. (Tr. 509 35, 885, 893-922, 1113; GX 301). In exchange, the narcotics traffickers agreed to pay the government officials in excess of one million dollars and to release to the officials a large quantity of cocaine, which would subsequently be distributed in the United States. (Tr. 509 35, 893-922). The central target of Umeh's attempted bribe was Mr. Fomba Sirleaf, the Director of the Liberian National Security Agency ("NSA"), who was also the son of the President of Liberia, Ms. Ellen Johnson Sirleaf. (Tr. 509-35, 893-922).

Umeh, however, was unaware that from the moment of his initial contact with the Liberian government officials, these officials began coordinating with the DEA in an operation

---

defendant's own medical conditions were clearly known and knowable to him since he made his first filing with the Court in June.

[5] This recitation is drawn directly from the Government's April 29, 2015 opposition to the defendant's motion to vacate his conviction pursuant to 28 U.S.C. § 2255. *See* Dkt. #144. A member of the Government's original trial team drafted it, so it is likely a more complete and accurate account than could be reconstructed anew from the cold record. "Tr." refers to the trial transcript, and "GX" refers to Government exhibits.

August 7, 2020
Page 4

to expose the membership and activities of the drug trafficking organization. (Tr. 144-80). In connection with that investigation, the DEA had a confidential source, using the name "Nabil Hage," introduce himself to Umeh as Mr. Sirleaf's business manager. (Tr. 149-52, 509-11). Hage was accompanied at some points in the investigation by another confidential source that used the name "Santiago." Hage recorded each meeting between Umeh, his Colombian counterparts, and the Liberian government officials. (Tr. 157-58). At subsequent meetings and conversations over the phone, Umeh negotiated the details of the payments to be made to the government officials and the organization's plans for the importation of the cocaine by air and sea shipment. (Tr. 535-82).

In February of 2010, Umeh asked "Nabil Hage" about pilots and aircraft available to assist with the movement of 4,000 kilograms of the cocaine. (Tr. 559-82). Hage then introduced Umeh to pilot Konstantin Yaroshenko, who had been in contact with another DEA confidential source regarding the movement of illicit goods. (Tr. 309-92, 559-82). In May of 2010, Yaroshenko flew from Russia to Liberia to negotiate the details of his anticipated work with Umeh. (Tr. 572-76). After a series of negotiations, Umeh agreed to pay Yaroshenko $4.5 million dollars to transfer the cocaine from Venezuela to Liberia as well as additional funds to subsequently transfer a portion of the cocaine to Ghana, where it was to be loaded on commercial flights to the United States. (Tr. 576).

In May of 2010, Umeh also introduced two other individuals to the Liberian government officials and Hage—Nathaniel French and Kudufia Mawuko. (Tr. 567-85). Umeh explained that these individuals would assist Umeh in the offloading of the cocaine from sea shipments and in the transportation of the cocaine within Africa. (Tr. 567-85). In late May and early June of 2010, Liberian officials arrested Umeh, Yaroshenko, French and Mawuko and turned them over to the custody of the DEA, which transported all four to the United States. (Tr. 177-80).

### B. The Defendant's Trial and Sentencing

In April 2011, the defendant stood trial on the charge of conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine, knowing that such substance1s would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 812, 959(a), 960(a)(3), and 960(b)(1)(B). On April 28, 2011, a jury found him guilty. (Tr. 1544-45). On July 28, 2011, this Court sentenced him to 360 months' imprisonment, citing, among other things, the extent of the trafficking conspiracy, the defendant's role in it, and the defendant's participation in the crime after having served a federal sentence for the same crime. *See generally* Dkt. #104 ("Sent. Tr.") at 18-20.

### C. The Defendant's Motion

On or about June 8, 2020, the defendant submitted to the Warden of Allenwood an email request for compassionate release, citing only "a serious case of High Blood Pressure" as the basis for release. *See* Ex. D. On June 11, 2020, the Warden denied the request. *See* Ex. E.

By letter dated May 28, 2020, the defendant petitioned this Court for compassionate release. *See* Dkt. #165. In the letter, the defendant described general conditions at Allenwood

August 7, 2020
Page 5

Low and throughout the BOP, but he failed to identify any personal health conditions or risk factors that make him particularly susceptible to COVID-19.  *Id.*  Accordingly, this Court denied the motion on June 23, 2020, citing the defendant's age, his good health at the time of sentencing, the lack of evidence of heightened risk from COVID-19, and the lack of documented cases of infection among inmates at any of the Allenwood facilities.  *See* Dkt. #166.

By letter dated July 1, 2020, the defendant asked the Court to appoint counsel to further develop his motion, including an argument based on his "uncontrolled hypertension, for which he is currently being treated," as well as his genetic predisposition to potentially developing sickle cell disease.  Dkt. #167.  On July 9, 2020, the Court appointed counsel file a motion for reconsideration.  *See* Dkt. #168.  Counsel filed such a motion on August 3, 2020, arguing, in essence, that COVID-19 has rendered all prisons categorically unsafe for inmates, especially those with medical conditions like the defendant's hypertension, sickle cell trait, and obesity.  *See* Dkt. #172.  For the reasons discussed herein, this argument is not compelling, the defendant does not qualify for release, and the Court's initial ruling should stand.

## II.  Applicable Law

### A.  Compassionate Release

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).

A motion under this provision may be made by either the BOP or a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  *Id.*  Once a defendant has exhausted his administrative remedies, the Court may then consider a motion for compassionate release.  As relevant here:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13. It provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3). *See Dillon v. United States*, 560 U.S. 817, 827 (2010); 28 U.S.C. § 994(t) (delegating authority to U.S. Sentencing Commission to define "extraordinary and compelling reason").

The Application Notes describe specific circumstances under which "extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13, app. n.1. The first relates to the defendant's own medical condition and requires that the defendant be: (1) suffering from a serious physical or medical condition; (2) suffering from a serious functional or cognitive impairment; or (3) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. U.S.S.G. § 1B1.13, app. n.1. The second applies when a defendant is at least 65 years old, is seriously physically or mentally deteriorating, and has served a prescribed amount of prison time. *Id.*, app. n.1(B). The third applies when the caretaker of a defendant's minor child(ren) dies or becomes incapacitated, or the defendant's spouse or registered partner becomes incapacitated and the defendant would be the only available caregiver for the spouse or registered partner. *Id.*, app. n.1(C). The fourth, entitled "Other Reasons," provides that compassionate release can be justified if "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*, app. n.1(D).

"[T]he existence *vel non* of 'extraordinary and compelling reasons' determines only whether a defendant can be considered for release—the existence of such reasons does not mandate release." *United States v. Ebbers*, No. S4 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020); *see also United States v. Israel*, No. 05 CR 1039 (CM), 2019 WL 6702522, at *11 (S.D.N.Y. Dec. 9, 2019) ("A court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition. . . . [Section 3582] was drafted using the word 'may,' not 'must.'").

If a court finds that a defendant qualifies for consideration, it must then consider the Section 3553(a) factors. Those factors include, among others: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . [and] to afford adequate deterrence to criminal conduct"; (3) the need "to provide the defendant with needed . . . medical care"; and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

The defendant bears the burden of showing that he is entitled to a sentence reduction or modification. *See, e.g.*, *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir.

2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

### B. Home Confinement

Under 18 U.S.C. § 3624(c), "[t]he authority to place a prisoner in a community correctional facility or in home confinement is . . . vested in the Director of the Bureau of Prisons." *United States v. Iosifidis*, No. 13 Cr. 170 (JFK), 2016 WL 3267329, at *2 (S.D.N.Y. June 9, 2016). As such, a district court "lacks jurisdiction to order that [a defendant] be placed in home confinement for the remainder of his term of imprisonment." *Id.*; *see also United States v. Ogarro*, No. 18-CR-373-9 (RJS), 2020 WL 1876300, at *6 (S.D.N.Y. Apr. 14, 2020) (home confinement is a remedy "exclusively within the discretion of the BOP; the Court lacks authority to order" it); *Jiminian v. United States*, No. 99 Cr. 968 (TPG), 2012 WL 470251, at *1 (S.D.N.Y. Feb. 10, 2012) (holding that the statute, "plainly creates no right of action in a prisoner desirous of home detention"). Put differently, unlike Section 3582(c), which empowers district courts to reduce an inmate's sentence under certain conditions, Section 3624(c) vests the authority to order a prisoner to serve out his or her sentence in home confinement exclusively within the discretion of the BOP. A separate statute, 18 U.S.C. § 3621, specifically contemplates that the Court may recommend home confinement; however, that recommendation is not binding on the BOP, and the BOP's decision is not subject to judicial review. *See* 18 U.S.C. § 3621(b) ("Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person. Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.").

### III. Discussion

#### A. The Defendant Has Not Demonstrated that Compassionate Release Is Appropriate in this Case

The defendant has not come close to establishing—and on the record before the Court, cannot establish—that he qualifies for compassionate release in light of his dangerousness and the other sentencing factors in § 3553(a). Indeed, his offense conduct and criminal history demonstrate beyond all doubt that he is a threat to the safety of others, as this Court found when sentencing him to 360 months' imprisonment—10 years above the applicable mandatory minimum. *See* PSR ¶ 107. The record amply supported all of the Court's reasons for finding that such a sentence was needed to achieve the purposes of sentencing, and those reasons have not changed. The defendant's offense conduct was egregious, as he was a primary participant in a conspiracy to traffic literally tons of cocaine around the world. *See generally* PSR ¶¶ 11-47. This was a highly lucrative and long-term profession for the defendant, and in 1995, it resulted in *four prior federal indictments* in four separate states (New Jersey, California, Florida, and Minnesota), ultimately leading to a guilty plea in each and a 97-month sentence. *Id.* at ¶¶ 64-72. That the defendant engaged in the offense conduct underlying this case after serving that 97-month sentence is a strong indication he will return to the same business if released now, after serving only 112 months.

At sentencing, the defendant was unapologetic about trafficking cocaine, admitting that he was a drug trafficker but insisting that he intended to transport drugs to Europe and Africa, thereby poisoning people in those countries, not the United States. *See* Sent. Tr. at 14-17 (defendant acknowledged that sending drugs to the United States would constitute "trying to destroy your community"). The Court rightly rejected this argument: "So the key issue in many respects in this trial . . . was whether this agreement included an agreement to import drugs into the United States. And the jury concluded beyond a reasonable doubt that it did. . . . That's binding on me, and even if it were not, I would reach the same conclusion." *Id.* at 18. The Court also dismissed the notion that the defendant's conduct was any less egregious simply because he intended for more drugs to be imported into places like the United Kingdom: "The UK has strong laws against the importation of cocaine into its country, takes a view perhaps not quite so stringent as the United States, but certainly not a view that cocaine distribution is anything other but an evil act." *Id.* at 19. The Court went on: "[T]here is also no doubt that from his very incarceration in the United States in New Jersey, he was acutely aware, not only of the United States' view, but of the view that, while hardly universal, is shared by a number of countries throughout the world, and he knew he was involved in an international, huge distribution plan of cocaine. So I do not find myself particularly sympathetic to his argument." *Id.* at 19. Finally, the Court addressed several of the § 3553(a) factors, nearly all of which "weigh[ed] heavily against the defendant," including that he knew well the consequences of from his other prior conviction," that "he wasn't just someone along for the ride, he was the prime mover," that the drug quantities involved were "of mammoth proportions mitigated only by the fact that some of that was directed at the United States," and that the defendant was "a long-term, professional drug dealer who intended to make a lot of money throughout the world really." *Id.* at 20. Because these factors have not materially changed in his favor, the defendant should not be freed from the rest of his duly imposed sentence. Moreover, his arguments at sentencing about "cultural relativism" and corruption in Nigeria only further prove that he believed his actions were justified and that he would seek to profit from the drug trade again if he were able.

Since the start of the pandemic, this Court and countless others in this District have repeatedly declined to free dangerous inmates and those for whom the statutory purposes of sentencing still support the initial sentence. *See United States v. Slater*, No. 04 Cr. 48 (JSR), Dkt. #1251 at 6-7 (S.D.N.Y. June 30, 2020) ("[A] consideration of the relevant § 3553(a) factors weighs against such release. In particular, just punishment of Slater's underlying offense conduct—in which he led a conspiracy that took over an entire housing development and [run] it as an outpost for illegal drug distribution for almost ten years—would not be served by what would be essentially a 123-month reduction of his 336-month sentence." (internal citation and quotation marks omitted)); *United States v. France*, No. 17 Cr. 724 (JSR), Dkt. #24 at 4 (S.D.N.Y. June 19, 2020) ("A further reduction in France's sentence, which was already below the applicable Guidelines range, would not reflect the seriousness of his crimes, provide just punishment, promote respect for the law, and afford specific and general deterrence."); *United States v. Al Kassar*, No. 07 Cr. 354 (JSR), 4/27/20 Tr. at 16-17 (S.D.N.Y. Apr. 27, 2020) ("I think it is a reasonable possibility, quite plausible, that he would be sorely tempted, once he returned to Syria, to resume that trade and thus be a danger to the community, both to the United States and to the world. So far as the Section 3553(a) factors, they almost all cut against him. There was more than ample basis for the Court to impose a 30-year sentence simply as a matter

of just punishment, let alone deterrence, and the like, and he has only served less than half of that."); *United States v. Pinto-Thomaz*, No. 18 Cr. 579 (JSR), Dkt. #189 at 2 (S.D.N.Y. Apr. 13, 2020) (denying release where "the sentence imposed by the Court was well below the Guidelines range and was, in the Court's view, the bare minimum necessary to satisfy the mandate of 18 U.S.C. § 3553(a)(1)").[6]  The same result should follow here.

      The factors that favored a substantial prison sentence are far more significant than the defendant's lone "extraordinary and compelling reason[]" for release: that within the last two years, his BMI has crept up from 29 in January 2018 to 30.6 in January 2020, which just barely meets the BMI 30 threshold for obesity.[7]  *See* Ex. A at 8; Ex. C at 10, 11.  This mildest of obesity is not permanent, can be addressed through basic diet and exercise, and is the only health condition he has that is known to increase a person's COVID-19 risks, according to the CDC.[8]  Discussing each of his other purported medical risk factors in turn:

---

[6] *See also, e.g.*, *United States v. Garcia,* No. 16 Cr. 719 (RJS), 2020 WL 2539078, at *3 (S.D.N.Y. May 19, 2020) ("The Court's reasons for imposing a sentence of one year and one day imprisonment on Garcia are just as applicable today as they were three months ago.  Releasing Garcia now, when he has served only about half of that sentence, would disserve those important interests."); *United States v. Goodman*, No. 16 Cr. 478 (CS), Dkt. #388 (S.D.N.Y. May 18, 2020) ("It would undermine several of the 3553(a) factors to release Defendant now, when he has served only about 40% of his sentence.  Such a substantial reduction would not give sufficient weight to the seriousness of the offense or Defendant's criminal history; it would undermine respect for the law; it would not amount to just punishment; it would undermine whatever deterrent value the sentence may have; it would introduce unwarranted sentencing disparities; and it would not sufficiently address the need to protect the public from further crimes of Defendant."); *United States v. Nieves*, No. 12 Cr. 931 (AJN), Dkt. #76 (S.D.N.Y. May 11, 2020) (denying release for defendant who had served "approximately half of his 192-month sentence," which remained appropriate based on dangerousness and other § 3553(a) factors); *United States v. Carr*, No. 14 Cr. 055 (LGS), 2020 WL 1689771, at *3 (S.D.N.Y. Apr. 7, 2020) (concluding that releasing the defendant in an oxycodone conspiracy just 73 months into a 132-month sentence would not accomplish the goals of sentencing including reflecting the seriousness of the offense, affording deterrence, or protecting the public); *United States v. Credidio*, No. 19 Cr. 111 (PAE), Dkt. #62 (S.D.N.Y. Mar. 30, 2020) (denying motion for compassionate release and reduction of sentence to home confinement for 72-year old defendant sentenced to 33 months' imprisonment because lengthy term of imprisonment was still required for reasons stated at sentencing).

[7] Until quite recently, the BMI threshold for obesity as a COVID-19 risk factor was 40.

[8] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

August 7, 2020
Page 10

- Essential hypertension, also called "primary" or "regular" hypertension, is not a proven COVID-19 risk factor; only *pulmonary* hypertension is.[9] The defendant's medical records since 2017—provided to the Court under seal as Exhibits A, B, and C—indicate that he suffers from "Hypertension, Unspecified essential." Ex. A at 2, 14, 17, 26; Ex. B. at 2, 8, 12, 31, 43; Ex. C at 2, 16, 22. There are no indications of pulmonary hypertension or any instances of any hypertensive or respiratory distress. Even the defendant's essential hypertension appears to be mild, with most of his blood pressure readings barely qualifying as hypertensive,[10] such that he has not requested or required blood pressure medication. *See* Ex. A at 16 ("States has had elevated BP readings in past but has never been on medication for blood pressure. States is exercising and watching diet to control pressure."); Ex. B at 1 ("He does not take any medications and tries to exercise and diet on most days of the week."); Ex. C at 14 ("He has been controlling the blood pressure with lifestyle measures . . . ."). The records' frequent entries and status updates regarding the defendant's condition also clearly demonstrate that BOP medical personnel are consistently and capably monitoring his health. Indeed, while the defendant characterizes his hypertension as "uncontrolled," he immediately acknowledges that "he is currently being treated" for it (indicating that it is, in fact, controlled). Dkt. #167.

- A genetic predisposition to potentially developing sickle cell disease someday is also not a COVID-19 risk factor or a compelling basis for immediate release from prison. Indeed, the very argument concedes that he *does not* currently suffer from sickle cell disease and that the risks he might face in the future are entirely speculative. Several times, the defendant's counseled brief misleadingly

---

[9] *See also United States v. Sattar*, No. 02 Cr. 395 (JGK), Dkt. #1089 at 6 (S.D.N.Y. June 17, 2020) (denying compassionate release to a 60-year-old inmate on the grounds that, among other things, "at this point, the [CDC] guidance suggests that pulmonary hypertension, which [the inmate] does not claim to suffer from, is a genuine risk factor, and the guidance does not suggest that regular hypertension, which [the inmate] does claim to suffer from, is a risk factor"); *see also Slater*, No. 04 Cr. 48 (JSR), Dkt. #1251 at 4-5 ("[G]eneric hypertension is a common condition shared by more than 75 million Americans and can usually be effectively managed through monitoring and medication." citing https://www.merckmanuals.com/professional/cardiovascular-disorders/hypertension/hypertension)).

[10] In the last three years, his blood pressure has consistently hovered around the 130/80 threshold for "Stage 1 high blood pressure" (the lowest level of hypertension)—a threshold that until 2017 was 140/90. *See* https://www.health.harvard.edu/blog/new-high-blood-pressure-guidelines-2017111712756. In particular, his blood pressure readings have been 124/76 (August 15, 2017), 137/85 (January 3, 2018), 112/80 (April 9, 2018), 133/79 (July 3, 2018), 130/82 (December 14, 2018), 148/81 (January 10, 2019), 128/82 (February 4, 2019), 135/78 (June 13, 2019), 139/84 (December 3, 2019), and 120/75 (January 15, 2020). *See* Ex. A at 16, 9, 6, 1; Ex. B at 30, 21, 12, 1; Ex. C at 14, 11.

>
> discusses the risks associated with full-blow sickle cell disease but fails to highlight the distinction between the disease (which the defendant *does not have*) and the mere genetic predisposition (which the defendant apparently does have). *See* Dkt. #172 at 2, 3, 10.  The defendant's PSR makes no mention of sickle cell at all, PSR ¶¶ 85-88, and his medical records reflect only that he has "sickle cell trait," Ex. A at 12, 14, 26; Ex. B at 2, 30, 31, 43; Ex. C at 14, 16, 22.  This confirms that, to date, he has experienced no actual adverse health effects relating to sickle cell.  The defendant also presents no evidence—or even argument—that the BOP would be unable to identify and treat sickle cell disease, if he ever develops it.[11]
>
> - At 51 years old,[12] the defendant is still well shy of 65, which is the age threshold above which accounts for approximately 80% of all deaths from COVID-19.[13]

There is simply no reason to believe that the BOP cannot appropriately monitor and treat these conditions, as they have done throughout the defendant's entire time in prison.  *See, e.g.*, *United States v. Merlo*, No. 17 Cr. 738 (LAK), 2020 WL 3001039, at *2 (S.D.N.Y. June 4, 2020) ("Moreover, even assuming that defendant's motion correctly catalogued his ailments, he would not have met his burden of proving that they warrant his early release in light of the COVID-19 pandemic.  Critically, defendant has adduced no evidence that these conditions cannot be managed in prison or that his health is unstable.").

As the Court is well aware, BOP has taken unprecedented steps to mitigate the risks of COVID-19 to inmates and staff, and it is housing the defendant at FCI Allenwood Low, where there has been *one* case of COVID-19 among inmates (and staff) since the start of the pandemic.[14]  BOP's success in limiting the spread of COVID-19 at most of its facilities is no doubt the result of the many preventative measures that the agency implemented months ago to

---

[11] *See United States v. Kevin Mora*, No. 18 Cr. 749 (DLC), Dkt. #177 at 2 (S.D.N.Y. May 27, 2020) (denying compassionate release to defendant who had served approximately 19 months of a 46-month sentence because his "petition rests largely on his carrying of the sickle cell trait," and he "acknowledges that he does not currently have sickle cell disorder or another illness.").

[12] The Warden's denial of release says that the defendant is 52 years old, *see* Ex. E; however, his PSR reports that his birthday is in January 1969, making him 51.  *See* PSR at 2.  In any event, the Government respectfully submits that the distinction should be immaterial to the outcome here.

[13] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[14] *See* https://www.bop.gov/coronavirus/.  Although part of the same complex, Allenwood Low is comprised of entirely separate buildings and inmate populations from Allenwood Medium and Allenwood USP.  Allenwood Medium and Allenwood USP each had one staff member test positive for COVID-19 early in the pandemic, both of whom fully recovered several months ago, and Allenwood USP has had a single staff member test positive more recently.  As of about a month ago, on July 7, 2020, a BOP representative advised the Government that 169 Allenwood inmates had been tested for COVID-19, and 100% of them came back negative.

August 7, 2020
Page 12

August 7, 2020
Page 12

ensure the health and safety of all inmates and staff. As the Court is no doubt aware from briefing in other cases, since the COVID-19 outbreak began, the BOP quickly and aggressively implemented an Action Plan, which remains in effect.[15] The defendant does not present a single argument about specific conditions at FCI Allenwood Low and instead relies on sweeping claims about how prisons are generally unsafe. *See* Dkt. #172 at 6-11. In many cases around the country, judges have reached the opposite conclusion, often finding that inmates may in fact be *less* at risk than the general American population. *See, e.g.*, *Chunn et al. v. Edge*, 20 Civ. 1590 (RPK) (RLM), Dkt. #112 (E.D.N.Y. June 9, 2020) (dismissing class action against the Metropolitan Detention Center, noting that "It is hard to say that prisoners are exposed to a risk that is not one that today's society chooses to tolerate, or a risk so grave that it violates contemporary standards of decency, if ***the risk inside the facility is no greater than—and perhaps less than—the risk outside of it***." (emphasis added; citation and quotation marks omitted)); *Wragg v. Ortiz*, --- F.3d ----, 2020 WL 2745247, at *22 (D.N.J. May 27, 2020) (dismissing class action against FCI Fort Dix, finding that "the ugly picture [inmate] Petitioners paint of FCI Fort Dix is not really a fair one," and ***inmates' principal claim about the extent of the health risks at the facility "ignores almost the entire record presented before this Court.***" (emphasis added)); *United States v. Lap Seng*, No. 15 Cr. 706, 2020 WL 2301202, at *9 (S.D.N.Y. May 8, 2020) ("[T]he blanket claim that the structure of BOP institutions and BOP's programming are conducive to the spread of COVID-19 assumes that the spread of COVID-19 cannot be mitigated with the implementation of BOP's action plan. [The defendant] does not provide support for this assertion and ***it is at best speculation that borders on hyperbole***." (emphasis added)); *United States v. Davenport*, 17 Cr. 61 (LAP), Dkt. #255 (S.D.N.Y. April 9, 2020) (denying release of a 52-year-old inmate with diabetes, hypertension, and myocardial infarction, holding that "Based on [the defendant's] relative youth and the facts that his medical conditions are well-controlled, that there are no COVID-19 cases at Schuylkill, and that Haverford [where he would live if released] has a high infection rate for COVID-19, the Court finds that [the defendant] has not demonstrated extraordinary and compelling reasons for release pursuant to 18 USC section 3582(c)(1)(A)."). The defendant offers no reason for this Court to find that Allenwood Low is unsafe for this defendant or any of its other inmates.

Finally, when considering the appropriateness of releasing the defendant for health reasons, it is important to compare conditions at FCI Allenwood Low to conditions in the place where he would live instead, which the Government presumes would be Nigeria. *See* Sent. Tr. at 10 ("I'm a Nigerian, not an American. I have never before in my life visited America in any way

---

[15] The Court has surely seen many submissions summarizing the Phases of the BOP's COVID-19 Action Plan, and the Government will not belabor the point again here. Information about each Phase can be found at the following sites:
https://www.bop.gov/resources/news/20200313_covid- 19.jsp;
https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf;
https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp;
https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf;
https://www.bop.gov/resources/news/pdfs/20200423_press_release_covid19_testing.pdf;
https://www.bop.gov/resources/news/pdfs/20200507_press_release_expanding_rapid_testing.pdf;
https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp.

August 7, 2020
Page 13

or in any form"); Dkt. #172 at 14 (defendant hopes to "return to Nigeria").[16]  While the United States' response to the pandemic has been flawed in many respects and uneven across states, the defendant bears the burden of establishing that release is appropriate.  He offers no evidence or argument that he would be healthier in Nigeria—a country that at sentencing he decried as "absolutely corrupt" to the point that he could not possibly corrupt it further, with "40 percent unemployment" and crippled by AIDS, poverty, and a lack of opportunity, Sent. Tr. at 10-11, 15, 17—than he is at a BOP facility with one sick inmate.  In early July 2020, the Brookings Institution found that "Nigeria is not prepared to respond to the current COVID-19 pandemic."[17]  Before the outbreak, the entire country of 200 million people had just 350 ventilators and 350 ICU beds.  Between the start of the pandemic and June 30, 2020, the entire country had tested just 138,462 people for COVID-19, which is roughly the number of people that were tested in New York City alone each week in June 2020.[18]  The notion that the defendant's life depends on his returning to Nigeria is frankly absurd.

### C. The Court Lacks Authority to Order Home Confinement, and in Any Event, Home Confinement Is Impossible and Inappropriate for this Defendant

As noted above, and as recognize by other Courts in this District, 18 U.S.C. § 3622 authorizes only the BOP to order an inmate's release to home confinement.  The defendant has not cited any authority that contradicts the sizeable body of case law cited above, or that would otherwise permit this Court to grant him this relief.

Even if there were legal authority for the Court to order home confinement, the defendant has not yet offered any proposal as to where he would serve such a term within the jurisdiction of U.S. federal courts.  At sentencing, the defendant repeatedly emphasized that he is a Nigerian citizen who had never been to the United States except to stand prosecution and serve prison sentences.  And if he does propose a residence in the United States, it is unclear that he can legally live there given his lack of legal status in this country.

Either way, home confinement for the remaining 20 years of his 30-year sentence would be an inappropriate result for the same reasons that outright release is inappropriate.

---

[16] The defendant indicates that he will submit to the Court a release plan that includes a "potential residence where he can be confined," suggesting that the residence will be in the United States.  Dkt. #172 at 16.  Even if he does, the Government has serious misgivings about the viability—and the legality—of ordering an inmate with no immigration status to live in the community, especially when his only ties to this country stem from his sending drugs here.

[17] https://www.brookings.edu/blog/future-development/2020/07/02/how-well-has-nigeria-responded-to-covid-19/.

[18] https://www1.nyc.gov/site/doh/covid/covid-19-data.page.

## IV.     Conclusion

For the reasons set forth above, the Government respectfully requests the Court deny the defendant's motion.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By: _____
Frank J. Balsamello
Assistant United States Attorney
(212) 637-2325

cc: Patrick Joyce, Esq., *counsel for defendant Chigbo Peter Umeh* (by ECF)